RECORD NO. 12-4515

═══════════════════════════════

In The

# United States Court of Appeals

### For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

## v.

## JARED BARALOTO,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE

───────────

## BRIEF OF APPELLANT

───────────

**Steven H. Levin**
LEVIN & CURLETT, LLC
**250 West Pratt Street, Suite 1300**
**Baltimore, Maryland 21201**
**(410) 545-5871**

*Counsel for Appellant*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION ............................................................ 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE .................................................................... 2

STATEMENT OF FACTS ........................................................................... 3

    I.     Introduction ................................................................ 3

    II.    The Government's Case in Chief ............................... 3

    III.   The Rule 29 Motion .................................................. 9

SUMMARY OF THE ARGUMENT ......................................................... 24

ARGUMENT ............................................................................................ 25

    I.     THE DISTRICT COURT ABUSED ITS DISCRETION
          BY ALLOWING THE GOVERNMENT'S
          COOPERATING WITNESSES TO SPECULATE THAT
          MR. BARALOTO'S MERCHANDISE WAS STOLEN,
          TO MR. BARALOTO'S PREJUDICE ................................... 25

          A.    Standard of Review ....................................... 25

          B.    The District Court Abused Its Discretion By
                Allowing The Government's Cooperators To
                Opine That Mr. Baraloto's Merchandise Was
                Stolen ............................................................ 25

          C.    The Improper Admission Of These Opinions
                 Prejudiced Mr. Baraloto ................................ 33

II.     The Evidence Was Insufficient To Prove That Mr.
        Baraloto Believed His Merchandise To Be Stolen – An
        Error Compounded When The Government Argued In
        Rebuttal, Over Objection, That The Jury Should Convict
        Because A Reasonable Person Would Have Concluded
        That The Merchandise Was Stolen........................................... 35

        A     Standard of Review......................................................... 35

        B.    There Was No Direct Evidence That The
              Defendant Believed His Merchandise To Be Stolen ..... 36

        C.    The Government Got Around Its Lack Of
              Evidence Of Mr. Baraloto's Knowledge By
              Arguing For A Negligence Standard – That A
              Reasonable Person Would Have Known The Items
              Were Stolen .................................................................... 48

CONCLUSION.............................................................................. 50

REQUEST FOR ORAL ARGUMENT ....................................... 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Brown v. Nucor Corp.*,
    576 F.3d 149 (4th Cir. 2009) ............................................................ 25

*Cooper v. Smith & Nephew, Inc.*,
    259 F.3d 194 (4th Cir. 2001) ............................................................ 33

*Jordan v. Medley*,
    711 F. 2d 211 (D.C. Cir. 1983) ........................................................ 34

*Kotteakos v. United States*,
    328 U.S. 750 (1946) ........................................................................ 34

*Taylor v. Virginia Union Univ.*,
    193 F.3d 219 (4th Cir. 1999) ............................................................ 34

*United States v. Campbell*,
    977 F.2d 854 (4th Cir. 1992) ............................................................ 49

*United States v. Dietrich*,
    865 F.2d 17 (2d Cir. 1988) ............................................................... 35

*United States v. Ebert*,
    178 F.3d 1287, 1999 WL 261590 (4th Cir. May 3, 1999) ........... *passim*

*United States v. Foster*,
    634 F.3d 243 (4th Cir. 2011) ........................................................... 48

*United States v. Heater*,
    63 F.3d 311 (4th Cir. 1995) ............................................................. 34

*United States v. Hickman*,
    626 F.3d 756 (4th Cir. 2010) ..................................................... 35, 36

*United States v. Johnson*,
    617 F.3d 286 (4th Cir. 2010) ..................................................... 25, 33

*United States v. Lighty*,
    616 F.3d 321 (4th Cir. 2010) ............................................................ 29

*United States v. Neal*,
    36. F.3d 1190 (1st Cir. 1994) ........................................................... 28

*United States v. Ruffin*,
    575 F.2d 346 (2d Cir. 1978) .............................................................. 34

## STATUTES

18 U.S.C. § 371 ........................................................................... 1, 2

18 U.S.C. § 1343 ............................................................................. 2

18 U.S.C. § 1349 ........................................................................ 1, 2

18 U.S.C. § 1956 ........................................................................ 1, 2

18 U.S.C. § 1956(h) ....................................................................... 2

18 U.S.C. § 2314 ........................................................................ 1, 2

18 U.S.C. § 3231 ............................................................................. 1

28 U.S.C. § 1291 ............................................................................. 1

## RULES

Fed. R. Crim. P. 29 ............................................................... *passim*

Fed. R. Evid. 401 .......................................................................... 17

Fed. R. Evid. 403 .......................................................................... 18

Fed. R. Evid. 602 ..................................................................... 26, 32

Fed. R. Evid. 701 ....................................................... 18, 26, 27, 28

Fed. R. Evid. 702 ..................................................................... 26, 30

**OTHER AUTHORITIES**

Black's Law Dictionary, 5th Edition (1979) ................................................. 33

Weinstein's Federal Evidence § 602.02 ....................................................... 26

Weinstein's Federal Evidence § 602-16 ....................................................... 28

Weinstein's Federal Evidence § 103.41(5)(f) .......................................... 34-35

## STATEMENT OF JURISDICTION

This is an appeal from a final judgment in a criminal case, entered against Jared Baraloto on July 12, 2012, in the United States District Court for the District of Maryland.  JA 2204.  On March 23, 2010, Mr. Baraloto was charged with conspiring and dealing in stolen merchandise and related offenses, in violation of 18 U.S.C. §§ 371, 2314, 1956 and 1349.  JA 117.  District court jurisdiction was based upon 18 U.S.C. § 3231.  Mr. Baraloto timely noticed this appeal on June 29, 2012, pursuant to the jurisdiction conferred on this Court by 28 U.S.C. § 1291.  JA 2184.

## STATEMENT OF THE ISSUES

**I.      Did The District Court Err By Repeatedly Allowing The Government's Cooperating Witnesses To Speculate  That Mr. Baraloto's Merchandise Was Stolen,  Where The Witnesses Had No Knowledge Of The Goods' Origins, And Drew Their Conclusions Based On Indicia That Are Fully Consistent With The Thriving, Legitimate Secondary Market In Those Goods?**

**II.      Was The Evidence Sufficient To Prove That Mr. Baraloto Believed His Merchandise Was Stolen, Rather Than Legitimately Salvaged, Where:**
**     A) The Government's Witnesses Conceded That These Same Items Were Traded In A Well-Established Secondary Market;**
**     B) There Was No Direct Evidence That Mr. Baraloto Understood The Merchandise To Be Stolen, Despite The Introduction Of Wiretapped Discussions, An Undercover Sale To Mr. Baraloto, Telephone Records, Financial Records, Search Warrant Evidence, Pole Camera Video, And Surveillance Video;**

1

**C) None Of The Government's Cooperating Witnesses Claimed That Mr. Baraloto Ever Indicated A Belief That The Items Were Stolen;**
**D) Mr. Baraloto Himself Helped Report The Purchases Of The Items To The Police, To Assist Them In Cracking Down On The Sale Of Stolen Goods; And**
**E) The Bulk Of The "Indicia" Of Illegal Activity Offered As Circumstantial Evidence By The Prosecution Has Actually Been Held, In An Unpublished Decision Of This Court, To Be Consistent With Legitimate Secondary Market Sales?**

## STATEMENT OF THE CASE

On March 23, 2010, a grand jury in the District of Maryland returned a one-count indictment charging Mr. Baraloto with Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h). JA 117.   On August 10, 2010, the grand jury returned a superseding indictment.  JA 31.  On April 20, 2011, the grand jury returned a second superseding indictment, charging Mr. Baraloto  with Conspiracy, Interstate Transportation of Stolen Property, Conspiracy to Commit Money Laundering, and Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. §§ 371, 2314, 1956, 1343 and 1349.  JA 240–50.

The case was tried before Judge Benson E. Legg from November 21 through December 9, 2011.  The jury convicted on all counts.  JA 1945.  On June 26, 2012, the district court denied Mr. Baraloto's motion for judgment of acquittal.  JA 2105–07.  On June 29, 2012, the district court sentenced Mr.

Baraloto to, among other things, 56 months' imprisonment.  JA 2175.  Mr.

Baraloto timely noted his appeal on June 29, 2012.  JA 2184.

## STATEMENT OF FACTS

### I.    Introduction.

Jared Baraloto is a legitimate businessman who buys and resells

salvaged health and beauty aids (HBA) and over-the-counter medications

(OTC) on the secondary market.  Retail stores regularly dispose of such

goods whose packaging has been updated by the manufacturer, that have

passed their "best-by" dates or have shorter-than-desired shelf lives, that are

damaged, that are unsold seasonal items, or any such goods that are no

longer selling well enough to justify their shelf space.  JA 1388–89.

Government witnesses acknowledged that there is a thriving and legitimate

secondary market in such merchandise.  JA 1136, 1312.

### II.    The Government's Case in Chief.

Mr. Baraloto typically bought his merchandise from the Fast Money

pawn shop, which purchased the items from other vendors or from members

of the public.  JA 825–26.  Thereafter, Mr. Baraloto delivered the items to

TS Liquidators, owned by Jerome Stal, for sale to vendors in New York,

New Jersey and Florida.  JA 1470.  Critically, the pawn shop's purchases

were recorded on sheets filed with the local police department, as part of law

enforcement efforts to ensure that stolen goods would not enter the marketplace.  JA 920–21, 978–79.  These sheets recorded the items purchased and the names and identifying information of the sellers.  JA 1191.

Nevertheless, the government alleged that Mr. Baraloto secretly believed that the items he bought and sold—that were reported to the police—were stolen.  And the district court concluded that a jury could find that Mr. Baraloto's "business plan"—and indeed, the business plan of every one of these businesses— "was all predicated on recruiting a cadre of addicts who would boost [steal] merchandise from stores and then bring it in on a regular basis."  JA 1563.

The government conceded that it had no direct evidence that Mr. Baraloto believed the items to be stolen,  JA 1481–82, 1555, and as discussed below, the government's circumstantial evidence was in part improperly admitted and in any case insufficient to support a conviction.  Mr. Baraloto now appeals his convictions for four counts that, despite charging different crimes, all turned on Mr. Baraloto's supposed secret understanding.

Substantial testimony focused on the practice of sheeting.  Jerald Bradford stated that he, Scott Bradford, Michael Ender, Pops Bradford and

other employees at his Fast Money pawn shop "sheeted everything." JA 891–92. Scott Bradford stated that information was given to the pawn shop unit of the county police department "straight on real time." JA 979.

Detective Ruffino, a law enforcement officer who participated in a controlled sale of "presumably stolen items" to Mr. Baraloto's colleague, while in Mr. Baraloto's presence, confirmed that during the controlled sale, she produced her driver's license and had to provide her social security number before completing the transaction. JA 1219. Relatedly, several of Mr. Baraloto's co-defendants testified that they were told everything they were doing was legal. Daniel Mimer testified that he was told that so long as everything was documented, the business was completely legal:

> 17 Q. You asked Mr. Stal if everything was legal, correct?
> 18 A. Correct.
> 19 Q. And he told you everything was legal?
> 20 A. Yes.
> 21 Q. He assured you that his lawyer said everything was legal?
> 22 A. Yes.
> 23 Q. He said a lawyer had told him as long as he documented
> 24 everything, everything was legal?
> 25 A. Yes.

JA 1127. Warren Allen Culver gave similar testimony:

> Q. When you [Warren Allen Culver] were arrested, you talked
> to Rob Reed; isn't that right?
> A. I talked to him?
> Q. Yes.
> A. Yes.

Q. You told him you didn't think you'd done anything wrong?
A. I was told it was legal.

JA 1192.  Michael Ender also stated that he was told that everything was legal:

1 Q. Did Mr. Jerry Bradford tell you everything was legitimate?
2 A. Yes, he did.
3 Q. So you had a direct conversation with Jerry Bradford?
4 A. He had told me, yes, everything was legitimate, as long as
5 it was paper.
6 Q. And everything was paper?
7 A. Yes.

JA 1115.

Amber Boothe, the only witness with actual, first-hand knowledge that any stolen goods were purchased by the Fast Money Pawnshop, because she had stolen them, never identified Mr. Baraloto as anyone other than someone she saw at the pawn shop.[1]  She did not state that she ever spoke with him or told him that any goods were stolen.

Substantial testimony also shed light on the ways that such a robust volume of items could have come into the Fast Money Pawnshop.  Warren Allen Culver described the practice of "couponing" where large quantities of merchandise can be purchased for pennies on the dollar:

Q. So you use coupons to purchase health and beauty aids?
A. Shampoo, toothpaste.
Q. And you save a lot of money doing this?

---

[1]  The record of trial reflects that Ms. Boothe stated "I do not know his name."  JA 1048.

6

A. Yes, I do.
Q. What kind of money do you save?
A. Depends on what's on sale. I could save in the hundreds.
Q. Hundreds in one purchase, you can save a couple hundred?
A. Best I ever did was $118 for 24 cents.
Q. You purchased a hundred worth of items for 24 cents?
A. Yes, I did. The store was tripling coupons.
Q. Which store?
A. Shopper.
Q. And just so it's clear, how does that tripling coupons work?
A. They'll triple up to 99 cents at a time. So if the coupon was 75 cents, and I had an item like two dollars, it would go up to two quarter, but it wouldn't go above what the item cost.

JA 1189–90.  Jerome Stal explained the role that diverters play in supplying

the secondary market:

Q. When you say you had some deals, what does that mean? Just tell us clearly what you mean by that.
A. Well, I bought -- some deals from the manufacturer, but also bought from companies that called diverters, and diverter is a company, they're a wholesaler, but when I was working with my father, he might have bought from McNeill [Stal's father's business], so a hundred, $200,000 a year, so these diverters, they buy say a million or 10 or $20 million from McNeill in a year, so they get obviously a reduction in price on, you know, whatever they were buying.  And then they could just sell it for same price or less than the manufacturer was selling it for. So I started my business from the diverters and selling to other wholesalers that I knew through the business I did with my father.
Q. Now, all of that was legitimate; is that correct?
A. Correct.

JA 1312.

7

Two of the government's own witnesses described the robust and extensive secondary market that exists for OTC/HBA, explaining the role that reclamation centers, buy-one-get-one-free sales, the cyclical demand for seasonal items, consumer returns, damaged packaging, new packaging, and shelf-pulls play in supplying the secondary market. JA 1183–85 (Warren Allen Culver); 1388 (Jerome Stal). Jerome Stal explained that retail stores would slash the prices of older items, and might also offer significant discounts through coupons, when the manufacturer introduced new versions of the item. JA 1387–88 (giving as an example how the price for regular Advil was cut when Advil liquigels was introduced). Stal explained how manufacturers sometimes produced too many new items for the demand, and retailers would offer significant deals to move the items off the shelves. JA 1388 (using an example of Vicks sinus medication). He testified that when items sold poorly, retailers would send them back to the manufacturer, which would sell them at a steep discount at a "reclamation center." JA 1388–89 (using an example of Proctor & Gamble's Prilosec). He had personally purchased large quantities of such returned items at reclamation centers. JA 1390–91 (giving examples of his legitimate purchases of entire pallets of Gillette razors and of Aleve pain relievers).

### III.    The Rule 29 Motion.

At the close of the government's case-in-chief, Mr. Baraloto made a Motion for a Judgment of Acquittal under Federal Rule of Criminal Procedure 29.  JA 1575.   Principally relying on this Court's unpublished decision in *United States v. Ebert*, 178 F.3d 1287, 1999 WL 261590 (4th Cir. May 3, 1999),  Mr. Baraloto argued that the evidence was insufficient for the jury to conclude that he believed the merchandise to be stolen.  Mr. Baraloto argued that the *Ebert* court examined the same type of evidence as the government presented in this trial—the volume of sales of salvaged OTC and HBA, the type of packaging, the clean-up operation designed to remove security tags and price stickers, and the profit margin—and concluded that such factors did not amount to suspicious circumstances that should have indicated to a defendant that the merchandise was stolen, as opposed to being legitimately salvaged.  JA 1575–76.  Because the government conceded that there had been no direct evidence of guilty knowledge, JA1481–82; 1555 ("The issue then really is whether Mr. Baraloto knew whether that's a defense that Mr. Baraloto knew that the items were stolen, and again I think the circumstantial evidence in this case is far more than adequate to hurdle the Rule 29 boundary"), and because as explained in *Ebert* the supposedly suspicious factors were not circumstantial evidence of

guilty knowledge, *Ebert*, 1999 WL 261590 at *32 ("As we have explained at length, there was nothing suspicious about Thomas's operation"), the evidence was insufficient to find that the defendant believed his merchandise to be stolen. JA 1579–87.

The court recognized that Mr. Baraloto and the pawn-shop owners had "sheeted" all of the allegedly stolen items—recording the names and driver's license information of the sellers and reporting them fully to the police. JA 1551. The court further recognized the power of the defendant's argument that "if the government wasn't worried about" the fact that Mr. Baraloto and the pawn shops were purchasing these items, "why should [he have been] worried about it? So that is a troublesome point." JA 1551.

Nevertheless, the court denied the motion, finding that "the most significant piece of evidence" was a videotape of individuals selling the HBA and OTC at the pawn shops. JA 1562. The court concluded that merely by seeing the "down on-their-luck individuals bringing large quantities of HBA into the store for sale," Mr. Baraloto "would reach the inescapable conclusion that these people, these customers, were boosters bringing in stolen merchandise for sale." JA 1562–63.

> There has been a substantial amount of testimony in this case that these people were drug addicts, and the game that was being played is inescapable because of the nature of these individuals characterized as drug addicts, the volume of the

goods.…The business plan for these businesses was all predicated on recruiting a cadre of addicts who would boost merchandise from stores and then bring it in on a regular basis. And my view is that is what the jury can properly determine.

*Id.*

The court followed that ruling with a 3-page order that it stated "is not comprehensive; it addresses only the main outline of *Ebert* and not its nuances." JA 1670–73. In the Order, the court stated that "*Ebert* stands for the useful proposition that, because there is a significant secondary market for HBA, certain factors that might initially appear suspicious are not, in fact, probative of the existence of a criminal enterprise." JA 1671–72. The court distinguished *Ebert* by stating that *Ebert* concerns "a different link in the distribution chain" insofar as those defendants bought from a fence rather than from boosters. JA 1672. The court also distinguished *Ebert* by stating that in Mr. Baraloto's case "there is direct evidence that Mr. Baraloto knew that the shops from which he purchased were being supplied by addicts and other down-on-their-luck individuals who were selling HBA they had stolen from retail stores." *Id.* The court noted that a number of witnesses testified that the "shops attracted addicts seeking immediate cash with which to purchase drugs. Mr. Baraloto, who spent considerable time in

11

the shops, especially Fast Money, was in a position to observe this fact."[2]  JA

at 1672.  The court concluded:

> [T]he surveillance tape taken inside the Easy Money pawn
> shop[3] is especially probative.  The jury could reasonably
> conclude that the customers captured on the tape would be
> incapable of obtaining the HBA by any legitimate means other
> than, perhaps, 'dumpster diving.'  Based on the appearance and
> behavior of the sellers, as well as the regularity with which they
> delivered large amounts of the same items, the jury could then
> conclude that Mr. Baraloto knew the HBA had not been
> obtained legally.

JA 1672.

The court did not rely on the supposedly suspicious circumstances that

the government rested upon—evidence that the Fourth Circuit in *Ebert*

explained was fully consistent with legitimate secondary market sales.

Instead, the court relied almost exclusively on the videotape.  Mr. Baraloto

has included the videotape in the record, and this Court will see that it

depicts nothing more than seemingly poor people, down on their luck,

making sales at a pawn shop.  As described previously, there is nothing

apparently illegal about the scenes on this tape. The fact that alleged drug

---

[2] Testimony at trial showed that Mr. Baraloto did frequent Fast Money; it is
unclear what other shops the District Court's order refers to, but in any case
there was no testimony suggesting that Mr. Baraloto interacted with "down-
on-their-luck" individuals at those shops.

[3] The surveillance tape was actually from the Fast Money Pawnshop.  The
District Court's apparent confusion is descriptive of the way that the
government treated the various pawn shops interchangeably even though Mr.
Baraloto's relationship was primarily with Fast Money.

addicts sold items at a pawn shop is not itself probative of whether the items were salvaged, donated, or stolen.

The district court's opinion did not elaborate on its prior claim of a "business plan to recruit addicts to steal items," JA 1670–73, likely because despite search warrant evidence, wiretaps, security and pole camera footage, and the testimony of seven alleged co-conspirators, there was no direct evidence of any such business plan.

As detailed further below, there are at least two sets of facts that strikingly rebut the district court's erroneous conclusion that Mr. Baraloto's business model depended on purchasing stolen goods from shoplifters.

First, despite Title III wiretap recordings of Jared Baraloto's telephone conversations, JA 824, search warrants executed on his home and place of business, JA 838, video from a surveillance camera in his business colleague's place of business, JA 812, and cooperator testimony from his customers, his business partner, and his employee, among others, there was *no* direct evidence that Mr. Baraloto believed or even suspected that the items he bought and sold were stolen.  The government cannot cite even one conversation—with his business partner, employee, alleged shoplifters or anyone else—that evidenced any "business plan" on Mr. Baraloto's part to recruit shoplifters, nor any knowledge on Mr. Baraloto's part that the items

13

at issue were stolen.  Not one witness testified to concocting or ever even *discussing* such a plan with Mr. Baraloto.  Indeed, a police detective conducted a controlled sale of "presumably stolen items" in the presence of Mr. Baraloto—and she, too, did not state or even imply that the items were stolen.[4]  JA 1220.

Second, as Government witnesses conceded, every purchase of the OTC/HBA that Fast Money made was meticulously recorded on pawn sheets and immediately filed with the local police department.[5]  JA 891.  These sheets described the nature of the allegedly stolen merchandise that was

---

[4] Q. Okay. The goal was to sell items that weren't even stolen; isn't that right?
A. The goal was to go in there and see if they would purchase those items from me.
Q. And those items were not stolen, were they?
A. No, they were not stolen.
[5] Q. Why did you sheet? First of all, did you sheet everything that came in the door?
A. I sheeted everything….
Q. And your other employees whose job it was to sheet items actually sheeted them, correct?
A. Yes.
Q. And then what happened to those sheets?
A. At the end of the week at the time, we would mail them in, then we changed over to electronic filing where it was sent over every night.
Q. And the police would occasionally come into your Fast Money and shop, correct?
A. Yes.

purchased, and its quantity and price.[6]  JA 1088.  Additionally, the identities of the sellers of these goods, including scanned images of their driver's licenses, were also recorded and kept on file.  *Id.*

He conducted his business in this fashion, entirely above-board and reporting every sale to the local police, for three years.  Defense Ex. 44. Forty-four thousand sheets were presented to the jury.  *Id.*  It is inconceivable that Mr. Baraloto would have ensured that these thousands of pages of sheets were filed with the police if he thought them to document his criminal conduct, if he had believed that the items being reported were stolen.

How could the jury, then, have convicted him?  The record reflects two explanations.  In making its case, the government bombarded the jury with evidence that this Circuit has held to be irrelevant, prejudicial, and subject to exclusion.  This Circuit has also held this evidence to be insufficient for a finding of guilt beyond a reasonable doubt.

The government's approach in this case was to parade a series of witnesses in to court to establish that the items that Mr. Baraloto bought

---

[6] I would take their driver's license, and I would start writing it out on a sheet of paper that goes to the pawn unit, itemizing each item, you know, what we had purchased, and I would total that, and they would sign the copy at the bottom as well, too, sign it, and we would go ahead and take care of paying in cash.

came into the Fast Money Pawnshop in large quantities, in individualized packaging, bore retail stickers that were subsequently removed, and were purchased by Fast Money at a price below retail. Not a single witness stated that Mr. Baraloto knew the items were stolen.[7] Instead, this evidence was presumably utilized to convince the jury that Mr. Baraloto "should have known" that the items were stolen and that he averted his eyes to their "true" origins. After losing its motion for a willful blindness instruction, the government was at a loss; its case-in-chief had concluded and it had no opportunity to attempt to introduce evidence of Mr. Baraloto's actual guilty knowledge. The government, at this point, was resigned to a strategy of convincing the jury that Mr. Baraloto "must have known" that the items were stolen.[8]

---

[7] *Ebert*, 178 F.3d at \*99–100 ("Of all the government's witnesses in this case, none could say that these seven defendants knew that the OTC and HBA Thomas sold was stolen…Thomas, the kingpin of the stolen OTC and HBA ring, who was on the witness stand for eight days, never testified that he told any of these defendants that he was selling stolen property").

[8] The government admitted to this strategy at sidebar on several occasions.

MR. RAMAN: I was speaking, Your Honor, about the fact that Mr. Baraloto was in Fast Money pawn shop all the time, which numerous witnesses have testified to, that anyone who would see people coming in the door with open sores, with, you know, all the other accoutrements of a drug addict as described in evidence. I was leading to the point that they would have direct knowledge of the fact that these items were stolen. JA 1902.

> And I don't, as I said, want to get into a discussion of how you know what you know. But knowledge is gained by, and you learn things by repetition, you see the same things day in and day out. That's how you learn. That's how Mr. Baraloto, who was exposed to this, learns...I mean, how could you be in that milieu and not know that the goods were stolen?

JA 1812–13.  This evidence and testimony did *not* speak to Mr. Baraloto's guilty knowledge, and was in any event subject to exclusion.  The government focused on this evidence and impermissibly demanded that the members of the jury "put themselves in the shoes" of Mr. Baraloto, and determine whether, based on the excludable evidence flaunted by the government, they, themselves "would have known" that the items were stolen.  This approach should have failed for at least four reasons.  First, the testimony and evidence provided by the Government in making its case was irrelevant and prejudicial and in violation of Federal Rules of Evidence 401

---

THE COURT: Well, so Mr. Raman, are you arguing that what would a reasonable person perceive if that person was in the pawn shop?

MR. RAMAN: Correct, Your Honor. It is what is. It is [sic—is it] objectively reasonable for someone to say I didn't know in light of all of these factors. It's perfectly appropriate.  JA 1889.

The government likewise advanced this theory during its response to Appellant's Rule 29 Motion:  "Anyone watching these scenes repeated day after day would reach the inescapable conclusion that these people, these customers, were boosters bringing in stolen merchandise for sale.  There has been a substantial amount of testimony in this case that these people were drug addicts, and the game that was being played is inescapable because of the nature of these individuals characterized as drug addicts, the volume of the goods."  JA 1562–63.

17

and 403. Second, the testimony offered by the Government's witnesses was expert testimony that should have been properly excluded by Rule 701.[9] Third, the evidence spoke to a subjective, rather than objective view of the facts, in violation of the district court's instructions. Finally, the evidence did not demonstrate that Mr. Baraloto knew the items were stolen.

First, government witnesses opined—and the government repeatedly argued—that numerous entirely innocent aspects of the secondary market in OTC and HBA were instead circumstantial evidence of criminal conduct. *See generally* JA 1804–1818. As will be explained below, the government witnesses had no personal knowledge that the items were stolen. Rather, the witnesses asserted—and the government asked the jury to find—that one could tell the items were stolen based on the volume of sales on the secondary market, packaging, the low price for these goods, and the need to remove price stickers reflecting the prior retail establishment. *Id.* at 1807–

---

[9] The district court explicitly allowed this expert testimony in over Mr. Baraloto's objection: I changed my mind under Rule 701, a witness can give a lay opinion provided that the criteria of 701 are met, based on personal observations, not the subject of, not the subject of expert testimony. So no specialized knowledge or training are required. And what essentially the witness is doing is pulling together observations based upon firsthand knowledge synthesizing them and then expressing an opinion… If a witness expresses a lay opinion under 701, that opinion is not received for a limited purpose. It's received as substantive evidence, and the substantive evidence that it bears upon at least in terms of Count 1 would be that the goods were stolen and that Mr. Baraloto knew that the goods were stolen or was willfully blind to that fact." JA 1279–81.

18

08. Yet, as this court has previously addressed in an unpublished opinion strikingly similar to Mr. Baraloto's case, these "indicia" are all aspects of the legitimate secondary market in HBA and OTC. *See United States v. Ebert*, 178 F.3d 1287, 1999 WL 261590 (4th Cir. 1999). The government brought its case, and presented its arguments and evidence to the jury, without seemingly having ever read *Ebert*. JA 1547. And even after the case was brought to its attention, the government continued wrongly to assert that these innocuous aspects of the secondary market were evidence of criminal conduct. JA 1804–1818

Second, this case sadly demonstrates the insidious effects of the unconscious prejudices that well-meaning people may hold. The most important factor to the District Court, when denying the defendant's Rule 29 motion, was the suggestion that the jury could *assume* the items were stolen based on the looks of the poor, inner-city pawn shop customers who sold them.[10] JA 1562. The government offered in evidence a video taken by a

---

[10] "In my view, the most significant piece of evidence is the tape recording, the surveillance tape that was taken inside of the Fast Money buy and sell shop. This evidence, this tape, could be taken by the jury as evidence of what happened inside that shop day after day. The tape clearly shows down on-their-luck individuals bringing large quantities of HBA into the store for sale. They were all well versed with the drill. They took the items out of the bags, lined them up on the counter, and were paid in cash. Anyone watching these scenes repeated day after day would reach the inescapable conclusion that these people, these customers, were boosters bringing in stolen

surveillance camera inside a pawn shop, where Mr. Baraloto was sometimes present. *Id.*

During Scott Bradford's testimony, the government played video footage of the Fast Money Pawnshop taken on March 24, 2010. The video depicts customers—most of whom appear to be African American—bringing large quantities of OTC/HBA into the shop, setting the items on the counter, and selling the items. The video clearly shows the items being inventoried and sheeted, and Scott Bradford agreed that Fast Money sheeted every single transaction. JA 978–79. The video had no sound, and so it was impossible for the jury to tell whether the customers were instructed to set the items on the counter, or whether they did so out of habit. The video does not show Mr. Baraloto interacting with customers, nor does it show him consciously avoiding the sales of OTC and HBA. Although it is unclear whether Mr. Baraloto observed these sales or whether he was in the back of the Fast Money store at the time, footage of his parked car demonstrated that he was on the premises when the footage was recorded.

While the video played, the government elicited testimony from Scott Bradford suggesting that, in his view, many of the customers were drug

merchandise for sale. There has been a substantial amount of testimony in this case that these people were drug addicts, and the game that was being played is inescapable because of the nature of these individuals characterized as drug addicts, the volume of the goods."

addicts.  *Id.* at 1012.  The government also elicited testimony concerning the

sale of a power tool and candles and, later during its closing, invited the jury

to conclude that these items were stolen.[11]  *Id.* at 1013, 1020.  No evidence

suggests that any of the items were, in fact, stolen, however.

Through the presentation of this video, the government invited the

jury to profile the customers of Fast Money Pawnshop and to conclude that

they were thieves and to make the baseless assumption, then, that Mr.

Baraloto knew the items they sold were stolen:

> You want to know what is in a person's mind. If you want to
> know what a person is thinking or what a person knows, look at
> what he says and does when he doesn't think anyone is
> watching… what's rolling on your screen right now… You see
> what he sees in Fast Money.

---

[11] "So this footage here, this is my 11th reason, this footage here shows you
what Mr. Baraloto did see and know and do when nobody was looking.  We
have -- I think that's crystal there. She's fencing something. You've got
Stretch, the tall guy with the Yankee candles. The man with the DeWalt
power tool. You have all these people coming in there. And remember where
that DeWalt power tool was recovered."  JA 1818.  Again, despite the
Government's attempt to demonstrate otherwise, the footage did not, in any
way, speak to what Mr. Baraloto "knew…when nobody was looking."  Nor
was any evidence presented that either the candles or the power tool was
stolen.

JA 1817.[12]  As in *Ebert*, nothing about these transactions indicated, by

director circumstantial proof, that the OTC and HBA was stolen, not

salvaged.  *Ebert* at *100.  The only way, without profiling the

customers, that a jury could view this footage and conclude that the

items were stolen is by considering the quantity of items sold, the

packaging of the items, or the way in which customers brought the

items into the store.  However, as stated in *Ebert*, these considerations

do not, as a matter of law, speak to whether the items were stolen.

Accordingly, no reasonable jury could conclude that any items

depicted in the video footage were stolen, nor could any reasonable

jury conclude that Mr. Baraloto had the subjective belief that these

items were stolen.

The government argued—to a jury that was perhaps unaccustomed to

the sight of inner-city poor people struggling to get by—that the routine day-

to-day customers depicted in the pawn shop video *must* be criminals—based

on their clothes, based on the fact that some struggled with alcohol or drug

---

[12] This tactic was, apparently, persuasive to the Court when it denied Mr. Baraloto's Rule 29 Motion:  "The tape clearly shows down on-their-luck individuals bringing large quantities of HBA into the store for sale. They were all well versed with the drill. They took the items out of the bags, lined them up on the counter, and were paid in cash. Anyone watching these scenes repeated day after day would reach the inescapable conclusion that these people, these customers, were boosters bringing in stolen merchandise for sale."  JA 1562.

addictions,[13] JA 1812; *see also* JA 941,[14] and even based merely on the

impoverished neighborhoods in which they lived.[15]  JA 1811.

   The government thereby rested its case of circumstantial evidence of

guilty knowledge on factors that this court in *Ebert* has already deemed *not*

to be evidence of guilty knowledge and on the not-so-subtle prejudices that

the jurors might have against the poor and the drug-addicted.[16] JA 1563.

   This evidence never should have been presented to the jury, and these

arguments never should have been made.  They were terribly, and unfairly,

prejudicial.  But they worked.  Despite the complete absence of probative

---

[13] As Jerry Bradford, Scott Bradford, Ashley Williams and Michael Ender testified, the customers, the drug addicts that came in there, they were jittery. They had needle marks. They were sometimes smelly. They were disheveled.

[14] Q. You're assuming somebody hooked on heroin must be stealing, correct?
A. I'd say about 95 percent of the heroin users I know steal, yes.
Q. Once again, you're assuming someone's who is addicted to drugs is stealing?
A. You can say I'm a skeptic.

[15] "The next item on my mental list is that Mr. Baraloto was well aware of the neighborhoods in which these pawn shops operated. You can see this sort of ring of them along the border of South Baltimore and Anne Arundel County or Baltimore County. These neighborhoods were described to you by some of the witnesses in the case as rough, dangerous, drug-infested. Somebody referred to a murder that had happened in the neighborhood. Jerry Bradford said that people would talk openly about going to a place called the bottom or the hole to score their drugs. This neighborhood was not where an honest person would necessarily go to choose to do business."

[16] "There has been a substantial amount of testimony in this case that these people were drug addicts, and the game that was being played is inescapable because of the nature of these individuals characterized as drug addicts…"

evidence of Mr. Baraloto's knowledge in the reams of wiretap tapes, search warrant returns, surveillance video, phone records, financial records, and cooperator testimony from his co-workers, his colleagues and his business partners—and despite compelling evidence of Mr. Baraloto's *lack* of criminal intent in that he recorded his purchases and filed the records with the police—the jury found him guilty.  JA 1945.

Mr. Baraloto now appeals to this Court to vacate this grave injustice. The district court sentenced him to fifty-six months imprisonment.  He asks that his conviction be overturned, and that he be released immediately.

## SUMMARY OF THE ARGUMENT

Over continuing objections, the government's case relied on the rank speculations of its cooperating lay witnesses to prove not only that the merchandise was stolen, but also to prove that Mr. Baraloto knew that it was stolen.  In proceeding this way, the government bombarded the jury with inadmissible and unfairly prejudicial evidence that had nothing to do with the key factual issue before the jury:  whether Mr. Baraloto *knew* the OTC/HBA he purchased from Fast Money was stolen.  This evidence, though prejudicial, was insufficient to prove Mr. Baraloto's knowledge —an essential element of each of the crimes for which he was charged.  The government therefore had to rely on an impermissible "reasonable person"

standard of knowledge that contravened both established case law and the

district court's own instructions.  Consequently, the jury convicted Mr.

Baraloto on a negligence standard of *mens rea*.

## ARGUMENT

**I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING THE GOVERNMENT'S COOPERATING WITNESSES TO SPECULATE THAT MR. BARALOTO'S MERCHANDISE WAS STOLEN, TO MR. BARALOTO'S PREJUDICE.**

### A.    Standard of Review

Evidentiary rulings are reviewed under the abuse of discretion

standard.  *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010).  "A

court has abused its discretion if its decision is guided by erroneous legal

principles or rests upon a clearly erroneous factual finding."  *Id*. (quoting

*Brown v. Nucor Corp.*, 576 F.3d 149, 161 (4th Cir. 2009)) (internal quotation

marks omitted)).

### B.    The District Court Abused Its Discretion By Allowing The Government's Cooperators To Opine That Mr. Baraloto's Merchandise Was Stolen.

Prosecutors improperly elicited opinions from numerous government

witnesses that Mr. Baraloto's merchandise was stolen.  This testimony was

not based on personal knowledge – the sole shoplifting witness apparently

never directly interacted with Mr. Baraloto and could only testify that she

"had seen him before . . . at the pawn shop."  JA 1048–49.   Rather, as

detailed below, the witnesses offered their opinions based on the appearance,

quantity, and price of the merchandise and based on the characteristics of the

sellers – all of which were equally consistent with sales on the legitimate

secondary market.  There was no sufficient foundation for these opinions,

and by bolstering the government's similarly flawed inferences, they unduly

prejudiced Mr. Baraloto.

> A non-expert witness's opinion testimony:
>
> is limited to those opinions or inferences which are (a) rationally
> based on the perception of the witness, (b) helpful to a clear
> understanding of the witness' testimony or the determination of a fact
> in issue, and (c) not based on scientific,
> technical, or other specialized knowledge within the scope of Rule
> 702.

Fed. R. Evid. 701.  Apart from expert opinions, a witness may not testify to

a matter unless the witness has personal knowledge of the matter.  Fed. R.

Evid. 602.  Whether opinion or not, testimony must be based on events

actually perceived by the witness.  *See*, *e.g.*,Weinstein's Federal Evidence

§ 602.02.

In this case, the government's witnesses gave opinions they were not

qualified to give, and for which they lacked sufficient bases.

The government's first fact witness, Jerald Bradford, opined, over

defense objection, that the OTC/HBA must have been stolen "if someone

came in with 20 boxes of Tylenol a hundred counts, 10 boxes of Prilosec, 42

counts and Fusion razor blades, going sell [sic] them to me for less than a

third of what they actually cost in the store." JA 885. He concededly had

not stolen the merchandise himself, nor was there any evidence that he told

Mr. Baraloto that the items were stolen. In fact, Mr. Bradford told others

that the items were not stolen. JA 1115. Mr. Bradford's conclusion was

based entirely on the cost and volume of the items.

A second government witness, Ashley Williams, testified, over a

continuing defense objection, JA 929–30, that *she believed* that many of the

OTC/HBA sold to Fast Money were stolen, basing her opinion on the

innocuous fact that store stickers were removed from the items. *See* JA

1061.

Although initially excluding the testimony, the court later "changed

[its] mind":

> under Rule 701, a witness can give a lay opinion provided that
> the criteria of 701 are met, based on personal observations, not
> the subject of, not the subject of expert testimony. So no
> specialized knowledge or training are required. And what
> essentially the witness is doing is pulling together observations
> based upon firsthand knowledge synthesizing them and then
> expressing an opinion.

JA 1279. Moreover, the court held that the jury could consider the witness's

opinion as substantive evidence that Mr. Baraloto believed the merchandise

was stolen: "If a witness expresses a lay opinion under 701, that opinion is not received for a limited purpose.  It's received as substantive evidence, and the substantive evidence that it bears upon at least in terms of Count 1 would be that the goods were stolen and that Mr. Baraloto knew that the goods were stolen . . . ."  JA 1280–81.

A third government witness, Warren Culver, also over a continuing objection, likewise testified that "stickers are on [merchandise] so people don't steal them."  JA 1161–62.  Like the other witnesses before him, he too had no personal knowledge informing his testimony.  In fact, in responding to Mr. Baraloto's objection, the government suggested no personal knowledge was even necessary, going so far as to argue to the Court that the purpose of the sticker was something "any lay person can testify to,"  JA 1162, notwithstanding Rule 701's precepts that a lay witness need only make observations supporting his position and explain those observations. Weinstein's Fed. Evid. § 602-16; *United States v. Neal*, 36. F.3d 1190, 1206 (1st Cir. 1994) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observation and experience").

Another government witness, Daniel Mimer, stated that, in his view, the stickers were put on OTC/HBA packaging "because of theft."  JA 1122. Like Culver, Mimer offered no support for this assumption.  JA 1122.

Still another government witness, Michael Ender, was permitted to testify, over a continuing defense objection, that he believed the customers were stealing the OTC/HBA ("they were out doing what they had to do", JA 1087) based on "the stuff that was coming in the business."  JA 1087.

A final government fact witness, Jerome Stal, was permitted, over objection, to use the expression "stolen" on multiple occasions when interpreting what words used on wiretap phone calls such as "HBA" and "order" and "checks" meant.  He offered no basis for this subjective belief. *See*, *e.g.*, JA 1460.  When asked why he thought certain OTC/HBA was stolen, he stated that the stickers, the volume, the prices, the containers, and the customers gave him this impression.

> **GOVERNMENT COUNSEL**:  Did anyone ever talk to you about reclamation centers or buy one get one free?

> **STAL:**   No. The people that I saw in there were basically, they weren't basically -- they were in there for getting cash back and spending that cash quickly. They didn't seem the type of person that they're disciplined to go do this for hours and hours and come into a pawn shop and sell it to the pawn shop.

> **DEFENSE COUNSEL**: Objection. Speculation, Your Honor.

> **THE COURT**:  I'll overrule the objection.

JA 1396.

Such speculative testimony was inadmissible.  As this Court stated in *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010), in addressing whether

29

a lay witness could opine on whether a defendant would have a positive influence on others in prison, "such testimony would have been no more than rank speculation."  Since Stal did not testify that he ever observed a theft first-hand or that he was offered a first-hand confession by a shoplifter, his testimony characterizing anything as "stolen" lacks proper foundation, both under *Ebert* and under Fed. R. Evid. 702 (unlike expert witnesses, lay witnesses are not given wide latitude to testify about things outside of the scope of their first-hand knowledge).  Additionally, he did not (and indeed, could not) testify as to Mr. Baraloto's own subjective understanding of the expressions.

In *United States v. Ebert*, 178 F.3d 1287, 1999 WL 261590 (4th Cir. 1999), this Court held that the volume of sales, the type of packaging, the clean-up operation designed to remove security tags and price stickers, and low price paid for the goods were all "entirely innocuous" aspects of the legitimate business of buying and selling salvaged HBA and OTCs, *id.* at *13, *14–22, and there was "nothing suspicious" about the defendant's operation, *id.* at *32.  In *Ebert*, the government charged the defendants with conspiring to buy and sell stolen over-the-counter drugs (OTC), such as aspirin, nasal spray and cough syrup, and health and beauty aids (HBA) such as razor blades, shampoo, and toothpaste.  *See Ebert*, 1999 WL 261590 at

30

*1.  The defendants all operated businesses that bought and/or sold OTC and HBA from government-cooperator Donald Thomas, who held himself out as a supplier of salvaged and liquidated OTC and HBA.  *Ebert*, 1999 WL 261590 at *1.  Thomas, it turns out, was actually a large-scale fence who bought stolen OTC and HBA from a number of shoplifters and small-time fences.  *See Ebert*, 1999 WL 261590 at *1.  The government had no evidence that the majority of the defendants knew the merchandise was stolen, but rather proceeded on the theory that the defendants were "deliberately ignorant to the true source of [the] OTC and HBA because [the cooperator's] operation was 'highly suspicious.'"  *Ebert*, 1999 WL 261590 at *1.  This Court rejected the government's theory, finding that various characteristics of the cooperator's operation upon which the government relied were not only *not* "highly suspicious," but indeed were entirely consistent with an innocent salvage operation dealing in OTC and HBA sold on the legitimate secondary market.  *Ebert*, 1999 WL 261590 at *13, *32, *passim*.

Mr. Baraloto's case is remarkably similar to *Ebert*, except that in this case the government argues that many of the same supposed "highly suspicious" circumstances gave Mr. Baraloto *actual knowledge* that the

31

merchandise was stolen.  The theory should have fared just as poorly in this case as it did in *Ebert*.

In *Ebert*, the prosecution called four non-expert witnesses who worked at reclamation centers, in the hope of proving the absence of a legitimate, secondary market for OTC and HBA.  *See Ebert*, 178 F.3d at *14–19.  The Fourth Circuit held, *inter alia*, that since the witnesses themselves had little experience in the salvage and liquidation industries and were not necessarily representative of others in their occupations, their testimony was "insufficient to prove that there was no market for high-quality salvaged and liquidated OTC."  *Id.* at *14–16; *see also id.* at *14 ("Indeed, none of these witnesses…professed to have personal knowledge about the size of the secondary market for OTC") (citing Fed. R. Evid. 602) (witnesses may only testify about personal knowledge).

By permitting the government witnesses to give these opinions in this case, the court allowed the jury to be misled that numerous entirely innocent aspects of the secondary market in OTC and HBA were instead circumstantial evidence of criminal conduct.  *See generally* JA 1804–1818.

Part of the problem with the improper opinions was that the witnesses were permitted to give their subjective, speculative, opinions involving an illegal market, rather than informed opinions about a secondary market,

32

which is legal.   *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200, 203

(4th Cir. 2001) (affirming exclusion of opinion testimony; "conclusory"

findings based on subjective beliefs are not competent opinions; rejecting

impermissible use of "*ipse dixit*" opinions).  For the most part, the opinions

at issue are accurately described as "*ipse dixit*" opinions, *i.e.*, "bare

assertion[s] resting on the authority of . . . individual[s]." Black's Law

Dictionary, 5th Edition (1979) at 743. These include the opinions, as

discussed *supra*, that a sticker meant that an item was stolen, or that the

volume meant the same.   These opinions, offered mostly by individuals who

had extremely limited experience in the stolen goods market, rather than the

legal secondary market, represent speculative and conclusory assertions that

cannot serve as the basis for conviction. *Cf. United States v. Johnson*, 617

F.3d 286, 292 (4th Cir. 2010) (lay witness opinion must be based on

personal knowledge). Here, none of the witnesses was sufficiently familiar

with the secondary goods market and their opinions were based on a vague

and superficial understanding of the practices of that market.

> **C.    The Improper Admission Of These Opinions Prejudiced Mr.
> Baraloto.**

The improper testimony set forth above, which the District Court

permitted over defense objections, bolstered the government's inaccurate

closing argument, which will be described below.

In order to find that a district court's error was not harmless, the reviewing court must determine that the ultimate judgment was substantially swayed by the error. *Cf. United States v. Heater*, 63 F.3d 311, 325 (4th Cir. 1995) (citations omitted).

If one cannot say, with fair assurance…that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999).

Erroneously admitted evidence is not harmless error where that evidence was primary evidence tending to show a material fact central to the government's case. *See*, *e.g. Jordan v. Medley*, 711 F. 2d 211, 218 (D.C. Cir. 1983) (improperly admitted testimony went directly to central issue of case and evidence on that issue was closely balanced). Moreover, when the government relies upon inadmissible evidence as its primary weapon in pursuing a conviction, reversal is especially warranted. *See*, *e.g.*, *United States v. Ruffin*, 575 F.2d 346, 360 (2d Cir. 1978) (substance of erroneously admitted testimony must have been in forefront of jurors' minds when they retired to deliberate, because of extent to which prosecutor dwelt on it both in opening summation and in rebuttal); Weinstein's Federal Evidence

§ 103.41(5)(f) (when improper evidence has been erroneously admitted, the reliance of counsel on that evidence in arguments is a factor that may be crucial in determining whether error is harmless). This is especially true "[w]hen the government's proof relies primarily on circumstantial evidence, trial errors tend to acquire greater significance. It takes less to tip the scales." *United States v. Dietrich*, 865 F.2d 17, 22 (2d Cir. 1988).

**II.    The Evidence Was Insufficient To Prove That Mr. Baraloto Believed His Merchandise To Be Stolen – An Error Compounded When The Government Argued In Rebuttal, Over Objection, That The Jury Should Convict Because A Reasonable Person Would Have Concluded That The Merchandise Was Stolen.**

**A    Standard of Review**

This Court reviews the denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the government. *See United States v. Hickman*, 626 F.3d 756, 762–63 (4th Cir. 2010). The Court is to "determine whether the conviction is supported by 'substantial evidence'," that is, "evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. " *Hickman*, 626 F.3d at 763 (internal quotations and citations omitted).

"Though this is a 'heavy burden,' it is by no means insuperable." *Hickman*, 626 F.3d at 763 (internal citation omitted).

**B.    There Was No Direct Evidence That The Defendant Believed His Merchandise To Be Stolen.**

The government set forth evidence showing that Appellant's co-defendants and other witnesses believed the goods were stolen based upon their knowledge of the quantity and variety of goods, along with packaging and the presence of stickers.  This testimony, of course, does not speak to Mr. Baraloto's own knowledge of the goods' allegedly stolen quality. Additionally, no qualified government witness testified about the size of the secondary market for OTC/HBA from which these goods might very well have originated, at least in Mr. Baraloto's mind.  In other words, the government offered no testimony from which a reasonable juror could conclude that there is little salvaged OTC/HBA to be found anywhere. Simply because certain witnesses testified that they found the volume, the presence of stickers, packaging and variety of goods to be suspicious is not evidence that Mr. Baraloto knew of the stolen nature of the OTC/HBA.  *See id.* at *35 n. 11.

The government failed to put forth evidence that a reasonable fact-finder of fact could accept as "adequate and sufficient to support a conclusion . . . beyond a reasonable doubt" that Mr. Baraloto knew that the items in question were stolen.  *Hickman*, 626 F.3d at 763.

36

As the government recognized, knowledge that the items in question had been stolen was an essential element of guilt for each of the four counts: "[i]n essence, the case boils down to one question, and this has been the fort of the fundamental question since the beginning of the case. . . . [D]id Mr. Baraloto know . . . that the goods were stolen?" JA 1804; *see also* JA 1888, 1893. The court instructed the jury that the defendant had to actually "know that the property is stolen. Negligence, recklessness, doesn't count, and knowledge can be proved either by direct or circumstantial evidence." JA 1769.[17]

The government conceded that it had no direct evidence of Mr. Baraloto's guilty knowledge, such as evidence that Mr. Baraloto witnessed any thefts or evidence that any coconspirator told "Mr. Baraloto that these items are stolen" – instead, the government's proof consisted entirely of circumstantial evidence. JA 1545. The complete lack of direct evidence that Mr. Baraloto believed the items were stolen was striking when compared to the scope of the government's investigation – wiretapped conversations, JA 824, surveillance video from inside a pawn shop, JA 1007, search warrant evidence, JA 838, business records, JA 885, a controlled sale by an

---

[17] The government disclaimed any reliance on willful blindness. JA 1558 ("And we are not resting on willful blindness, I should be very clear on that.").

undercover officer, JA 1201, testimony from a shoplifter, JA 1038, and
testimony from Mr. Baraloto's business partner, JA 1362, and supplier, JA
899. Yet none of this produced any direct evidence that Mr. Baraloto
believed his merchandise to be stolen.

Moreover, the court recognized the "troublesome point" that – at the
same time the government maintained that Mr. Baraloto was knowingly
purchasing stolen merchandise – he himself knew that the items he was
purchasing were reported to law enforcement on sheets. JA 1551, JA 1213–
14. Fast Money "sheeted" the purchases from the individuals who, the
government maintained, were shoplifters – cataloguing the items they
brought in for sale, making copies of their drivers' licenses, and filing these
sheets with the local police. JA 1551 [Rule 29 motion at 55], JA 920–21, JA
979, *see also* JA 1115 ("Everything was paper"). When items were reported
as stolen, those items were "held" in compliance with the law. JA 965–66.

The government responded that "sheeting stolen property doesn't
make it okay," JA 1552, 1901 – but detailing one's purchases for the police
does suggest that Mr. Baraloto *was unaware* the property was stolen.

In closing, the government enumerated twelve ways the jury
supposedly could know that Mr. Baraloto knew his merchandise was stolen.
JA 1804. When combined with the government witnesses' improper

opinions and – as described further below – the government's prejudicial misstatement of the standard for finding knowledge – this argument apparently swayed the jurors.  However, these twelve reasons were based on false inferences that this Circuit has already rejected in *Ebert*, or were based on prejudices rather than facts.

**First**, the government claimed that "the sheer volume of the goods" demonstrated that the merchandise was stolen, maintaining that "[y]ou don't get that kind of volume by driving around clipping coupons and going to different stores to get buy one get one free. You can't get that kind of volume that way." JA 1804.   To the extent the government witnesses stated as much, their testimony were unsupported lay opinions and should have been excluded.   To the contrary, the existence of a legitimate and considerable secondary market for OTC and HBA was confirmed by Culver, JA 1185, and by Stal, JA 1389.

As this Court observed in *Ebert*, dealing in a large quantity of salvaged goods is not self-evidently suspicious.  "This is a circular argument. . . . [T]he volume and variety of OTC . . . was not suspicious on its face."  *Ebert*, 1999 WL 261590 at *20 ("If an average juror could not be expected to know that Thomas's OTC was stolen simply from the large volume he sold, then neither could the defendants").

Relatedly, the government argued that the fact that the OTC/HBA were presented to Fast Money individually and in plastic bags evidences its stolen nature. JA 1554. The government acknowledged that Mr. Baraloto knew that the items were purchased from individual customers. JA 1554. As the Fourth Circuit said in the *Ebert* case:

> [a] reasonable person would expect that OTC and HBA might be salvaged from any number of places (for example, at a retailer's going out of business sale or in a dumpster behind a wholesaler's warehouse) where individual products are unlikely to be in any large container, much less neatly packed in their factory boxes.

*Ebert*, 178 F.3d at *21. Thus, testimony or evidence that the items were presented to Fast Money individually in bags was not circumstantial evidence of Mr. Baraloto's belief that the items were stolen.

**Second**, the government cited the "amount of money" made by Mr. Baraloto as evidence that he knew the items were stolen: "You're buying health and beauty aids and over-the-counter goods for ridiculously low prices and selling them for close to normal prices online." JA 1805. Obviously, the cost of used, discarded, damaged, or short-shelf-lived products can be expected to be far less than the price paid by the consumer for new – or cleaned up – products. Culver, a government witness, testified that he once purchased $118 worth of goods for 24 cents. JA 1189. Government witness Stal similarly stated that he could purchase items for

below-wholesale prices on the secondary market, giving an example

involving Aleve.  JA 1390–91.  As the Fourth Circuit has observed:

> Common sense dictates that if there is a market for salvaged or liquidated OTC and HBA, the price of goods in that market would necessarily be below the price that retailers pay wholesalers for the same goods.  If not, no one would ever buy secondhand merchandise in bulk to resell to retailers.  If a wholesaler could buy brand new merchandise for the same price (or a lower price) as secondhand merchandise, he surely would do so, since he is likely to be able to sell the former at a higher price.

*Ebert*, 1999 WL 261590 at *22.  Thus, the amount of money that Mr.

Baraloto's business made was not circumstantial evidence that Mr. Baraloto

believed his merchandise to be stolen.[18]

**Third**, the government argued that Mr. Baraloto brought home a

DeWalt random orbit palm sander, which in closing argument the

government only refers to as Exhibit 1BB, that was brought in to a pawn

shop the night prior to the execution of a search warrant at Mr. Baraloto's

home.  JA 1807, 1028.   Other than to suggest that the pawn shop failed to

---

[18]  In *Ebert*, the court noted that "[e]ven if a jury could infer that the defendants sold their goods at less than the wholesale price because they were selling to wholesalers, this was not suspicious because the defendants were buying OTC in eastern North Carolina and selling it in New York City or the Washington, D.C. Area.  It is commonly known that prices may be higher in major metropolitan areas in the Northeast than in smaller cities in the South."  1999 WL 261590 at *22.  In this case, Stal resold the items to vendors in New York, New Jersey and Florida, which Stal admitted are more expensive markets.  JA 1470, 1471.

hold the item for the appropriate period of time, the government presented

absolutely no evidence that the sander had been stolen. JA 1028–1029,

1818.

**Fourth**, the government cited Stal's cleanup operation as evidence

that Mr. Baraloto knew the items were stolen. JA at 1807. Yet the Fourth

Circuit has given four reasons that such cleaning operations are

characteristics of legitimate secondary-market businesses, and are not indicia

of crime:

> The third supposedly "highly suspicious" circumstance, that
> Thomas and the defendants all "cleaned" the stolen OTC and
> HBA by removing price tags, anti-theft devices, and marks
> made by the product's previous owner, was not in reality
> suspicious. First, . . . secondary market businessmen keep the
> sources of their supply secret so that their customers do not buy
> them out . . . . Second, if a salvage dealer does not take the
> retailer's price tags off the merchandise when he buys and sells
> it for less than the retail price, his buyer could cause the retailer
> to lose money by returning it to the retailer in exchange for the
> full retail price. . . . Third, common sense tells us that anyone
> who buys second hand goods from a salvage dealer would have
> more luck reselling them to the public if they were cleaned to
> look like new, instead of goods from another store. [Fourth],
> since some of the defendants apparently were trying to pass off
> salvaged OTC as new (or were selling to redistributors who did
> so), it makes sense that they had cleanup operations.

*Ebert*, 1999 WL 261590 at *21. Stal, himself, testified that the cleanup

operations were needed to conceal the goods' origin for the perfectly

legitimate reason that retailers do not want to not sell their competitors'

merchandise.  JA 1335–36.  *See also Ebert*, 1999 WL 261590 at *21 ("Thus, even if Thomas salvaged OTC from local retailers, the defendants could have expected him to take any identification marks off of the product to conceal their origin").  In light of the wholly innocent explanation for these cleanup efforts, the government should not have been surprised that it "was being done in plain view" where "anybody could see it," JA 1807–08 — the cleaning operation was perfectly consistent with legitimate business, and does not suggest that Mr. Baraloto would have believed the goods to be stolen.  *See Ebert*, 1999 WL 261590 at *21 (reciting testimony that "the fact that somebody has a clean-up operation is in no way sinister or bad or showing any evil intent").

**Fifth**, the government argued that Mr. Baraloto must have known that the items were stolen because he knew that his business partner, Stal, "had done time for the same offense."  JA 1808.  But there was no evidence to this effect, and the defendant's objection was sustained.  JA 1808–10.  The evidence was that only Mr. Baraloto knew that Mr. Stal had once served time in prison (and, in fact, it had been for structuring monetary transactions).  JA 1472.  Nothing in the record made Stal's old conviction relevant to Mr. Baraloto's business.

**Sixth**, the government argued that Mr. Baraloto must have known that the items were stolen because pawn shops are operated in "rough, dangerous, drug-infested neighborhoods." JA 1811. But a poor neighborhood is the kind of place where people would be willing to go "dumpster diving" to salvage thrown-away merchandise. The government asserted without support that this neighborhood was not where an "honest person would necessarily go to choose to do business." JA 1811. But that was exactly the neighborhood where it would be worthwhile to salvage merchandise.

**Seventh**, the government argued that the individuals selling the merchandise to the pawn shops were drug addicts. JA 1812. According to the government, they were not the type of people who would have the discipline to clip coupons to get the merchandise. JA 1812. But poor, down-on-their-luck individuals might be exactly the type who would salvage discarded goods from dumpsters and trash cans. *Cf. Ebert*, 1999 WL 261590 at *17 ("Daniels also acknowledged that Winn Dixie 'destroyed' OTC by discarding it into a dumpster . . . .").

**Eighth**, the government argued that Mr. Baraloto must have known that the items were stolen because of the low price paid for them by Fast Money Pawnshop. JA 1814. But this was merely a rehash of the argument

the government made about the amount of Mr. Baraloto profits, which this

Circuit's *Ebert* decision rebuts. *Ebert*, 1999 WL 261590 at *22 ("Common

sense dictates that if there is a market for salvaged or liquidated OTC and

HBA, the price of goods in that market would necessarily be below the price

that retailers pay wholesalers for the same goods.")

**<u>Ninth</u>**, the government attacked the manner in which the business was

conducted, asking "[i]n how many real businesses do you routinely pay part

in cash and part in the check?  That just doesn't make sense, unless you're

hiding something from someone."  JA 1816.  The government pointed out

that there was evidence of a transaction occurring in the middle of the night

in a parking lot, and argued "[t]hat's not typical of an up-and-up business."

JA 1816.  But a business may be operated unusually – in *Ebert*, the Court

discussed the highly similar facts that a businessman "often transacted

business in cash" and "delivered merchandise in parking lots" – and "this is

not a crime."  *Ebert*, 1999 WL 261590 at *32.  There was no evidence in this

case that these factors were related to Mr. Baraloto believing the

merchandise to be stolen.  *Cf. Ebert*, 1999 WL 261590 at *32 ("And there is

nothing in the record to indicate that these seven defendants viewed his

business as a criminal operation" despite the odd manner in which it was

conducted.)

**Tenth**, the government pointed to the testimony of Amber Boothe, the only witness to testify that she had brought in stolen goods to Fast Money. But as in *Ebert*, the fact that a small quantity of items were proven to be stolen was not enough to find that the defendants had the requisite knowledge necessary for a conviction. *See Ebert*, 1999 WL 261590 at *13. Notably, Ms. Boothe did not testify that she ever told Mr. Baraloto she had stolen the merchandise. Indeed, she did not even know his name. JA 1048.

**Eleventh**, the government invited the jury to profile the customers of Fast Money Pawnshop based on a surveillance video, and to conclude from their looks that they must be thieves selling stolen goods. JA 1817. The district court found this videotape to be "the most significant piece of evidence" that Mr. Baraloto knew the items were stolen. JA 1562–63. The court observed that the tape shows "down on-their-luck individuals bringing large quantities of HBA into the store for sale. They were all well versed with the drill. They took the items out of the bags, lined them up on the counter, and were paid in cash." JA 1562. From this scene, the district court concluded that "Anyone watching these scenes repeated day after day would reach the inescapable conclusion that these people, these customers, were boosters bringing in stolen merchandise for sale." JA 1562–63.

This argument may have resonated with a jury that was perhaps unaccustomed to the sight of inner-city poor people struggling to get by. It is a rehashing of the argument, discussed above, that the sellers must be shoplifters because many of them apparently had drug addictions. But this conclusion is little more than a symptom of preconceptions fed by television and film. There was no competent evidence that drug addicts or poor people are thieves, or – and this is the critical point – that Mr. Baraloto believed them to be.

**Twelfth** and finally, the government cited wiretapped conversations between Messrs. Baraloto and Stal. JA 1819. Certain of these conversations merely repeated that some customers were drug addicts. The final conversation – after the raids and arrests – depicts Mr. Baraloto upset and worried about law enforcement and about what will happen if the government twists his words. JA 1820. Like every other factor, this one is entirely ambiguous.

The government recognized that no "one or two of these factors that I've listed for you would be sufficient alone to give rise to the inference that Mr. Baraloto knew" his merchandise was stolen. JA 1813. But the flaw in the government's logic is that *every one* of its factors was equally consistent with a legitimate salvage operation. There was no direct evidence of guilty

knowledge, and *all* of the circumstantial evidence was ambiguous.  Twelve

zeroes still add up to zero.  There simply was not sufficient evidence for a

rational jury to conclude beyond a reasonable doubt that Mr. Baraloto

knowingly participated in a criminal conspiracy or knowingly sold stolen

goods.  *See United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011) (Court

expressed "concern about the inclination of the Government toward using

whatever facts are present, no matter how innocent, as indicia of suspicious

activity.")

### C.    The Government Got Around Its Lack Of Evidence Of Mr. Baraloto's Knowledge By Arguing For A Negligence Standard – That A  Reasonable Person Would Have Known The Items Were Stolen.

Despite the lack of evidence of Mr. Baraloto's knowledge, the

government persuaded the jury to convict him because in rebuttal it misled

the jury into believing that it could convict regardless whether there was

evidence that Mr. Baraloto knew the merchandise was stolen.  After the

court gave its instructions, and after it was too late for the defendant's

closing argument to correct it, the government in rebuttal told the jury that it

could find Mr. Baraloto guilty if a "reasonable person" would have

concluded that the items were stolen.  JA 1889.  The defense objected.  *Id.*

At sidebar, the government made its position on the definition of

knowledge absolutely clear:

> **THE COURT**:  Well, so Mr. Raman, are you arguing that what would a reasonable person perceive if that person was in the pawn shop?
>
> **[The Government]**:  Correct, Your Honor.  It is what is.  It is [sic – is it] objectively reasonable for someone to say I didn't know in light of all of these factors.  It's perfectly appropriate.

JA 1889.

The government's "reasonable person" definition of knowledge would convert these crimes, which require *actual, subjective knowledge* that the items are stolen, into a negligence standard by which a defendant can be convicted if he *did not know* the items were stolen, but a reasonable person would have known.  This is squarely contrary to the law in the Fourth Circuit. *See United States v. Campbell*, 977 F.2d 854, 857 (4th Cir. 1992) ("In assessing Campbell's culpability, it must be noted that the statute requires actual subjective knowledge. Campbell cannot be convicted on what she objectively should have known."); *see*, *e.g*, *Ebert*, 1999 WL 261590 *20 ("When it comes to knowledge, a criminal defendant is not required to be a reasonable person.  Mere negligence does not equate to actual knowledge . . . .").

Despite the defendant's objection, the district court did not reinstruct the jury nor did it correct the prejudicial misimpression given by the government's mistaken standard of law in its rebuttal argument.  Instead, the

court seemed to conclude that the government's error was related to commentary on the defendant's right not to testify. The court gave the defendant his "objection for the record," but found that by playing a portion of a surveillance tape that demonstrated lack of knowledge, the defendant had opened the door for the government's statement in rebuttal. JA 1889–90.

The district court's failure to correct the government's misstatement of law poisoned the jury's view of the evidence. For although none of these factors suggested that *Mr. Baraloto* himself knew the items were stolen, the jury was apparently convinced that a reasonable person would have known – for they returned convictions.

## CONCLUSION

The evidence in this case failed to establish that Mr. Baraloto knew that the OTC/HBA items were stolen. But the government's improper opinion testimony, and inaccurate statement of the legal standard, prejudiced the jury

WHEREFORE, Mr. Baraloto respectfully requests that this Court vacate the verdict and enter a judgment of acquittal.

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests that the Court allow for oral argument on the issues raised herein.

Respectfully submitted,


/s/ Steven H. Levin
Steven H. Levin
LEVIN & CURLETT LLC
250 West Pratt Street
Suite 1300
Baltimore MD 21201

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P.
        28.1(e)(2) or 32(a)(7)(B) because:

        [ X ] this brief contains [*11,906*] words, excluding the parts of the
        brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

        [     ] this brief uses a monospaced typeface and contains [*state the
        number of*] lines of text, excluding the parts of the brief exempted by
        Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.
        32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6)
        because:

        [ X ] this brief has been prepared in a proportionally spaced typeface
        using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

        [     ] this brief has been prepared in a monospaced typeface using
        [*state name and version of word processing program*] with [*state
        number of characters per inch and name of type style*].


Dated: December 10, 2012          /s/ Steven H. Levin
                                  *Counsel for Apellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 10th day of December, 2012, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

> Sujit Raman
> OFFICE OF THE U.S. ATTORNEY
> 36 South Charles Street, Fourth Floor
> Baltimore, Maryland 21201
> (410) 209-4973
>
> *Counsel for Appellee*

I further certify that on this 10th day of December, 2012, I caused the required copies of the Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Steven H. Levin
*Counsel for Appellant*