RECORD NO. 12-4515

In The
# United States Court of Appeals
## For The Fourth Circuit

## UNITED STATES OF AMERICA,

*Plaintiff – Appellee*,

**v.**

## JARED BARALOTO,

*Defendant – Appellant*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## AT BALTIMORE

_____

## REPLY BRIEF OF APPELLANT

_____

Steven H. Levin
LEVIN & CURLETT, LLC
250 West Pratt Street, Suite 1300
Baltimore, Maryland 21201
(410) 545-5871

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

I.      The District Court Erred By Permitting "Lay Opinion" Testimony
        That Ambiguous Characteristics Meant The Items Were Stolen ...................3

        A.      Rule 701(a) Only Permits Conclusions Rationally Based On
                First-Hand Perceptions ..........................................................................3

        B.      The Testimony Violated Rule 701(c), Which Only Permits Lay
                Opinions That Do Not Require Scientific, Technical or
                Specialized Knowledge Within the Scope of 702 ................................8

II.     There Was Insufficient Evidence To Prove Mr. Baraloto Himself
        Knew The Items At Issue Were Stolen .........................................................11

        A.      The Evidence Against Mr. Baraloto Was Not Substantial.................11

III.    These Errors Were Not Harmless .................................................................15

CONCLUSION .........................................................................................17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF CONTENTS

**Page(s)**

**CASES**

*Certain Underwriters at Lloyd's London v. Sinkovich*,
    232 F.3d 200 (4th Cir. 2000)...........................................................................5

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993)......................................................................................7

*TLT-Babcock, Inc. v. Emerson Elec. Co.*,
    33 F.3d 397 (4th Cir. 1994)........................................................................4, 5

*United States v. Dukagjini*,
    326 F.3d 45 (2d Cir. 2003)............................................................................7

*United States v. Ebert*,
    178 F.3d 1287, 1999 WL 261590 (4th Cir. 1999) ................................6, 7, 15

*United States v. Garcia*,
    413 F.3d 201 (2d Cir. 2005)....................................................................3, 8, 9

*United States v. Glenn*,
    312 F.3d 58 (2d Cir. 2002)........................................................................5, 8

*United States v. Johnson*,
    617 F.3d 286 (4th Cir. 2010)........................................................................5

*United States v. Perkins*,
    470 F.3d 150 (4th Cir. 2006)........................................................................5

*United States v. Sokolow*,
    490 U.S. 1 (1989).........................................................................................7

*United States v. Sowards*,
    690 F.3d 583 (4th Cir. 2012) .......................................................................7

## RULES

Fed. R. Crim. P. 16 .................................................................................9

Fed. R. Crim. P. 16(a)(1)(G) ...............................................................10

Fed. R. Crim. P. 29.................................................................................2

Fed. R. Evid. 701 ...........................................................................3, 5, 10

Fed. R. Evid. 701(a) ...................................................................3, 4, 5, 6

Fed. R. Evid. 701(c) ..........................................................................5, 8, 9

Fed. R. Evid. 702 ...........................................................................4, 8, 10

Fed. R. Evid. 703 ...................................................................................7

## OTHER AUTHORITY

4 Joseph M. McLaughlin et al.,
Weinstein's Federal Evidence § 701.03[1] (2d ed. 2011) ...................3, 10

## REPLY BRIEF OF JARED BARALOTO

The district court made two prejudicial errors, which the government repeats in its brief.

First, the government's cooperating witnesses gave the jurors their "lay opinions" that items were stolen, based on their observation of a series of entirely ambiguous factors such as merchandise bearing retail stickers. The government did not suggest, nor could it, that these witnesses had observed a theft first-hand. Nor did the government offer these witnesses as experts with the specialized knowledge that would be necessary to distinguish items bearing retail stickers because they were stolen, from items bearing such stickers because they were 1) legitimately purchased from a reclamation center, 2) purchased with coupons from the retailer, or 3) unsold inventory salvaged after the retailer discarded it in a dumpster. A lay witness, without specialized knowledge or expertise in the lawful secondary market of health and beauty aids (HBA), cannot tell merely from looking at a pile of items whether some or all of them were salvaged or stolen.

Had the defendant been given notice that the government was going to be permitted to introduce this expert testimony, it could have called its own expert to explain the secondary market in HBA. By allowing this improper "lay opinion" testimony without qualifying the witnesses as experts, the district court allowed potentially unreliable and improper opinion evidence to taint the jury.

1

Second, the government offered no substantial evidence that Mr. Baraloto himself actually knew the items were stolen. The government's brief mischaracterizes the record, highlights evidence of which Mr. Baraloto was not aware, and focuses on facts that are entirely ambiguous. The actual evidence offered did not support a jury verdict of guilt, and the district court erred by not granting the defendant's Rule 29 motions.

The jury concluded that Mr. Baraloto knew the goods were stolen. But it did so because of two legal errors that irretrievably prejudiced Mr. Baraloto. By allowing the government's cooperators to repeatedly offer their "lay opinion" that ambiguous characteristics meant the goods were stolen, the jury was led to believe that Mr. Baraloto – who saw at least some of the ambiguous characteristics – would also have concluded that the goods were stolen. Second, by focusing the jury on what a reasonable person would have concluded, the government asked the jury *not* to consider what Mr. Baraloto actually knew, but rather to convict him if they themselves would have believed the items to be stolen.

In the absence of these errors, the jury would never have convicted Mr. Baraloto. His conviction should be vacated.

I.     **The District Court Erred By Permitting "Lay Opinion" Testimony That Ambiguous Characteristics Meant The Items Were Stolen.**

A.     **Rule 701(a) Only Permits Conclusions Rationally Based On First-Hand Perceptions.**

The district court erred when it allowed witness after witness to offer the lay opinion that items were stolen, despite the witnesses' lack of any first-hand knowledge about the origin of the items.  (JA 885, 988, 1061, 1087, 1122, 1161-62, 1396).

Rule 701(a) requires lay opinion testimony to be "rationally based on the witness's perception."  Fed. R. Evid. 701(a).  Since the Rule's adoption in 1975, the advisory committee's notes have stated that this provision "is the familiar requirement of first-hand knowledge or observation."  As a result, proper Rule 701 opinion testimony must be based on events the witness "personally perceive[d]." 4 Joseph M. McLaughlin et al., Weinstein's Federal Evidence § 701.03[1] (2d ed. 2011) (citing authority).  As the Second Circuit put it, "the rule recognizes the common sense behind the saying that, sometimes, 'you had to be there.'" *United States v. Garcia*, 413 F.3d 201, 211-12 (2d Cir. 2005).

Properly understood, lay opinion testimony thus allows a lay witness to opine that a defendant appeared agitated when he spoke.  *See* Fed. R. Evid. 701 advisory committee's note. Here, the government defends an interpretation of Rule 701 that would instead allow the lay witness to further opine that the agitated

3

defendant must have done something wrong, even though there may be equally legitimate explanations for the manner in which he spoke.

The government argues that the witnesses did have first-hand knowledge that the items were new, had stickers, came in high volume, were in their original packaging, and some customers appeared to have needle marks, and could therefore properly opine that these characteristics meant the items were stolen. Brief at 51-52. The government is wrong for two reasons.

First, the government's interpretation reads the requirement of "first-hand knowledge" right out of Rule 701(a)'s requirement that lay opinion be "rationally based *on the perception of the witness*." The government's view is inconsistent with this circuit's case law, which allows a witness to offer lay opinion testimony only about events that the witness personally participated in or contemporaneously observed. *See, e.g., TLT-Babcock, Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994) (witness's testimony was not "based on his own perceptions" when others were his "eyes and ears in the field" and witness could therefore not opine on the cause of a mechanical failure without being admitted under Fed. R. Evid. 702). The opinions of Jerald Bradford, Scott Bradford, Ashley Williams, Michael Ender, Daniel Mimer, Warren Culver and Jerome Stal, as they related to the aforementioned ambiguous factors, were clearly not "based on the perception of

the witness" because the witnesses did not personally perceive the items being

stolen.  (JA 885, 988-989, 993-994, 1061, 1087, 1122, 1161-62, 1396).

The Fourth Circuit has held that an agent's interpretations of intercepted

phone calls based on "interviews with suspects and charged members of the

conspiracy after listening to the phone calls" were "post-hoc assessments [that

could not] be credited as a substitute for the personal knowledge and perception

required under Rule 701."  *United States v. Johnson*, 617 F.3d 286, 293 (4th Cir.

2010).  This is because, in the Fourth Circuit's view, "post-wiretap interviews,"

"statements made by codefendants," and "experience as a DEA agent" all

constitute "second-hand information" that does not "qualif[y] as the foundational

personal perception needed under Rule 701."  *Id.* at 292-93; *see also TLT-Babcock,*

*Inc. v. Emerson Elec. Co.*, 33 F.3d 397, 400 (4th Cir. 1994); *Certain Underwriters*

*at Lloyd's London v. Sinkovich*, 232 F.3d 200, 204 (4th Cir. 2000) (excluding lay

opinion testimony "derived from . . . investigation and . . . analysis of the data"

because it is not "first-hand knowledge" as required by the Rule); *United States v.*

*Perkins*, 470 F.3d 150, 155-56 (4th Cir. 2006) ("lay opinion testimony must be

based on personal knowledge"); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir.

2002) (reversing a conviction and suppressing testimony offered by the

government's lay witness under both Rule 701(a) and 701(c), where that witness

stated that he observed a bulge in the defendant's pants and concluded, without

first-hand knowledge of the item, that it was a gun based on the lay witness's

knowledge of "how people carry guns").

The second error in the government's argument is that the district court

allowed opinions that, even if based on the perception of the witness, were not

"*rationally* based" on those perceptions as Rule 701(a) requires. A witness who

opines that the low cost of the items means those items must therefore have been

stolen (JA 885) offers more than first-hand perceptions to the jury and makes a

conclusion not rationally based on his observations.[1]  The Fourth Circuit agreed

when it observed that:

> Common sense dictates that if there is a market for salvaged or
> liquidated OTC and HBA, the price of goods in that market would
> necessarily be below the price that retailers pay wholesalers for the
> same goods.  If not, no one would ever buy secondhand merchandise
> in bulk to resell to retailers.  If a wholesaler could buy brand new
> merchandise for the same price (or a lower price) as secondhand
> merchandise, he surely would do so, since he is likely to be able to
> sell the former at a higher price.

*United States v. Ebert*, 178 F.3d 1287, at *22, 1999 WL 261590 (4th Cir.

1999) (unpublished).

The government's response is that each witness only testified to what he or

she personally observed and then drew an inference based on those observations.

---

[1] Cf. *United States v. Sowards*, 690 F.3d 583, 591 n. 9 (4th Cir. 2012)(decrying the use of "imprecise stereotypes of what criminals look like, or on the basis of irrelevant personal characteristics such as race") (quoting *United States v. Sokolow*, 490 U.S. 1, 12 (1989) (Marshall, J., dissenting)(citations omitted).

Brief at 49-52.  To be sure, several of the witnesses observed stickers, high volume, and certain type of packaging, but those first-hand observations cannot rationally lead to the conclusion that the items must have been stolen, in light of the numerous legitimate sources which equally explain the indicia that the witnesses perceived.  *Ebert*, 178 F.3d 1287, at *13, 21-23 (packaging, removal of stickers, and low prices were "entirely innocuous" in light of other explanations, such as a secondary market).

The government's approach has particularly pernicious effects on the relationship between lay and expert testimony.  Experts, of course, are allowed to opine on matters about which they have no first-hand knowledge.  Indeed, they may base their testimony on evidence that is itself inadmissible, so long as they do so in the process of applying their expertise and such reliance is standard in their field.  *See* Fed. R. Evid. 703; *see also United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003).  But experts are allowed this leeway precisely because their testimony is subject to rigorous methodological and procedural safeguards.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993).  These rigorous checks ensure that the "expert's opinion will have a reliable basis in the knowledge and experience of his discipline."  *Id*.

7

Conversely, lay opinion testimony is not subject to those safeguards, but is instead checked by the requirement that it must be rationally based on first-hand perception.

### B.    The Testimony Violated Rule 701(c), Which Only Permits Lay Opinions That Do Not Require Scientific, Technical or Specialized Knowledge Within the Scope of 702.

The district court erred in permitting the lay opinions here for an additional, independent reason: they were based on the witnesses' "specialized knowledge" within the scope of Rule 702's provision for expert testimony.

Rule 701(c) allows lay opinion testimony only where it is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Lay opinions are inadmissible "if the [witness's] reasoning process depended, in whole or in part, on his specialized training and experience."  *See United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005); *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) (disallowing the opinion of a cooperating drug-dealer witness about the manner in which drug dealers carry guns because, *inter alia*, such testimony could only have been offered by an expert and was not admissible under Rule 701(c)).  The Rule "prevent[s] a party from conflating expert and lay opinion testimony," as the government attempts to do here, "thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert

testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in

Fed. R. Crim. P. 16." *Garcia*, 413 F.3d at 215-16.

In this case, the district court conflated lay and expert testimony when it

justified its admission on the basis that "the witness was putting things together, as

a matter of common sense, *based upon his familiarity with the industry*." (JA 873

(emphasis added)). The government's witnesses could not draw the conclusion

that the ambiguous factors meant the goods are stolen, unless they had "(c) . . .

specialized knowledge within the scope of rule 702," to wit, that reclamation

centers and couponing and dumpster diving cannot account for sufficient quantities

of new HBA to explain Mr. Baraloto's purchases. This isn't "common sense": it

requires experience and expertise in the secondary market for HBA. A lay person

simply does not know what quantity of like-new HBA is thrown away by retail

stores because it is unsold or because its packaging is damaged. Perhaps a

dumpster diver can find large quantities of like-new HBA if he or she goes on six-

hour drives up and down the East Coast, visiting dumpsters in parking lots of every

CVS. Or perhaps a salvager can get large quantities of like-new HBA from

reclamation centers. By having their cooperators opine that the goods were stolen,

the government in effect asked the witnesses to apply specialized knowledge of the

market, without first attempting to qualify the witnesses as experts, in violation of

Rule 701(c). *See United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005) ("If the

opinion rests 'in any way' upon scientific, technical, or specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." (quoting 4 Weinstein's Federal Evidence § 701.03[1])).

Indeed, the government did not attempt to qualify its witnesses as experts, nor did it give the notice required under Federal Rule of Criminal Procedure 16(a)(1)(G) that it would rely upon expert testimony, notwithstanding an October 26, 2011, defense request for such disclosure via email, which is available upon request. By permitting the witnesses to speculate as to the meaning of the retail stickers, high volume of goods, packaging and the like, the district court abused its discretion.

This is classic expert testimony of which Rule 702 requires courts to be the gatekeepers. Had the district court properly considered this as expert testimony, the court would have been required to inquire into the qualifications of the government's cooperators to give this opinion. Did they have enough experience, training or education in the secondary market for HBA to offer a reliable opinion about whether the quantity of goods at issue in this case could be obtained through dumpster diving, couponing or reclamation centers? That determination, under Rule 702, would require the court to consider whether the expert's testimony was based on sufficient facts or data (such as the number of reclamation centers in the Baltimore area, or the size of the secondary market in HBAs), whether it is the

10

product of reliable principles and methods, and whether the expert's principles and methods have been applied reliably in this case.

By treating the witness's testimony as "lay opinion," the district court allowed the cooperators to give opinions that required specialized knowledge, without sufficiently testing the reliability of the witness's supposed expertise.

## II.      There Was Insufficient Evidence To Prove Mr. Baraloto Himself Knew The Items At Issue Were Stolen.

### A.      The Evidence Against Mr. Baraloto Was Not Substantial.

In its effort to persuade this Court that the evidence of Mr. Baraloto's guilt was "substantial," the government's brief mischaracterizes certain evidence, relies on other evidence of which Mr. Baraloto was not aware, and repeats the "indicia" that, without expert testimony, are entirely ambiguous as to whether the goods were stolen or legitimately obtained.

The government's most flagrant mischaracterization is its reliance here – and its similar reliance at trial – on a wiretap recording from four days after Mr. Baraloto's arrest.  The government tells this Court that the taped conversation evidences Mr. Baraloto's guilty knowledge because, *four days* after his arrest, "Baraloto expresses no surprise that he had been charged with the interstate transportation of stolen property."  Brief at 56.  But the government objected to and now dismisses as "self-serving hearsay" a tape conversation from *two* days after

11

his arrest, on which Mr. Baraloto expressed *just such* disbelief and surprise.  Brief at 34; (JA 1479-80, 1495-96).

The government's argument to the jury regarding this tape recording was equally misleading.  In its closing argument, the government highlighted the *four*-days-after-arrest tape, arguing that "the 'most telling part is the part that comes even after the take-down, after the arrest, and Mr. Baraloto is upset . . . [He] isn't saying my God, this stuff was stolen, you never told me, what have you gotten me into?  My God, I had no idea."  (JA 1819-20); Brief at 40.  Meanwhile, the government vigorously opposed allowing the jury to hear the *two*-days-after-arrest tape.  (JA 1479-1518); Brief at 34 & n.17.  When that tape was eventually played, the government's cooperator confirmed that "he understood Baraloto at that time to be asserting his alleged belief that the items they dealt in had not been stolen."  (JA 1479, 1520).

Mr. Baraloto stated on his *two*-days-after-arrest tape:

Baraloto:     Yea well I mean it's like… it just seems very strange to me that they're gonna say "you know, you know, you know."  Well, I never witnessed anybody ever steal anything. I never, nobody ever told me that anything was stolen how could I ever know something was unless I saw it or someone told me? You know, it's just bullshit.

Stal:          Well, we'll see what happens.

12

Baraloto:    And I think we did everything in our power to make sure it wasn't. So, I don't know.

Stal:    I'm definitely not going to disagree with you.

(JA 1495-96). This conversation was admitted only for its impeachment value. (JA 1479-1518). But the government improperly used that ruling both as a sword and a shield, claiming that the *four*-days-after-arrest tape was incriminating precisely because it did not contain the protestations of innocence that the jury was not allowed to hear on the *two*-days-after-arrest tape. (JA 1820).

The government's brief now denounces the fact that the jury was permitted to hear this truthful and revealing tape, even for the limited purpose for which it was admitted. Brief at 42-44.

The government further claims that the tape's limited admission somehow justified the government's complete misstatement of its burden of proof. Brief at 59. In what the government apparently thought was a tit-for-tat response to the defendant's discussion of the *two*-days-after-arrest tape in his closing argument, Brief at 45, 59, the government told the jury to focus *not* on what the defendant actually knew, but on what a "reasonable person" would have known. Brief at 44-45; (JA 1888-89). This argument and related arguments improperly lowered the government's burden of proof, leading directly to Mr. Baraloto's unsupported conviction.

13

The government's recitation also focuses on evidence that proved the goods were stolen – but of which Mr. Baraloto was not aware.  For example, the government goes on at length about conversations in which Mr. Baraloto did not participate.  Brief at 14, 24-25, 57.  The strongest evidence that any items were stolen came from the testimony of a shoplifter – who never suggested that she had ever spoken to Mr. Baraloto.  Brief at 16; (JA 1048-49).  The government's brief also suggests that Mr. Baraloto "would have overheard" the customers' conversations about having been "'on vacation' (i.e. in jail)."  Brief at 14.  As the transcript reflects, Mr. Bradford only confirmed that Mr. Baraloto was "in a position" to overhear things in the store, without identifying what Mr. Baraloto actually would have been in a position to hear. (JA 999). Contrary to the government's brief, there was no evidence that Mr. Baraloto overheard any of these alleged conversations.

Finally, the government's brief is replete with references to those characteristics that are entirely ambiguous about whether the goods were purchased with coupons, reclaimed, or stolen – such as the manner in which the goods were packaged, or the fact that the goods looked like new, or came with retail stickers still on them, Brief at 10, or the volume of goods, Brief at 57.  This Court has had occasion to consider these characteristics before, and has explained that there is nothing suspicious about them:

14

The third supposedly "highly suspicious" circumstance, that Thomas and the defendants all "cleaned" the stolen OTC and HBA by removing price tags, anti-theft devices, and marks made by the product's previous owner, was not in reality suspicious…[c]ommon sense tells us that anyone who buys secondhand goods from a salvage dealer would have more luck reselling them to the public if they were cleaned to look like new, instead of goods from another store.

*Ebert*, 178 F.3d at *21.

With respect to the packaging, this Court has recognized that "OTC and HBA might be salvaged from any number of places (for example, at a retailer's going out of business sale or in a dumpster behind a wholesaler's warehouse) where individual products are unlikely to be in any large container, much less neatly packed in their factory boxes." *Ebert*, 178 F.3d at *21.

The jury found otherwise only because of the improperly admitted, and unsupported "lay opinion" testimony from the government's cooperators, as discussed above.

### III.    These Errors Were Not Harmless.

Both the admission of the improper lay opinions and the government's misstatement of its burden of proof prejudiced Mr. Baraloto; neither was harmless.

The government argues that the admission of the improper lay opinions that the items were stolen was harmless because Amber Boothe's testimony sufficiently demonstrated that Mr. Baraloto's goods were in fact stolen.  Brief at 53-54.  But that misses the point.  Mr. Baraloto does not deny that, having heard

15

Ms. Boothe testify, we *now know* that at least the goods that came from her were stolen. But by allowing so many witnesses improperly to claim that various ambiguous indicia – newness, the presence of retail stickers, the volume of goods, cheap price, the possibility that some of the customers at some point had had a drug addiction – meant the items were stolen because the secondary market (reclamation centers, couponing, dumpster diving) could not account for the goods, the district court misled the jury into concluding that any reasonable person who saw these indicia would believe that the goods were stolen.

This error was particularly prejudicial when considered along with the government's uncorrected statement to the jury lowering its burden of proof to the "reasonable person" standard.

The jury was told it could convict the defendant if the jurors would have believed the items were stolen–"[a]nyone can look at that with your own eyes, and you would see that they were stolen," (JA 1892), or if they thought they would have acted the way Mr. Baraloto acted post-indictment– "put yourself in your [sic] shoes, if you had just been arrested, indicted," (JA 1930), or if they thought a reasonable person would so believe ("any reasonable person sitting in Fast Money pawn shop watching a parade of people.") (JA 1888). After hearing the government and so many witnesses claim – improperly – that otherwise ambiguous

indicia meant the items were stolen, the jurors were bound to conclude that *they* would have drawn such a conclusion, and thus they convicted.

But that is not what the law prescribes. To convict someone upon proof that a "reasonable person" would believe the items were stolen is to reduce the mens rea of "knowingly" to a negligence-standard. Yet that is exactly what the government argued that the mens rea standard should be. (JA 1888, 1892, 1930). And the government made this argument for the last time in its rebuttal, when the defendant could not reply.

Although Mr. Baraloto objected, the district court failed to advise the jury not to consider these improper arguments. (JA 1888-1892, 1930). The district court should have reaffirmed that the standard was not "what would a reasonable person" have thought, or "what would a juror" have thought, but was "what did Mr. Baraloto think." By failing to correct this misstatement of the governing legal standard, the district court fatally prejudiced the defendant and poisoned the verdict.

## CONCLUSION

For the above-stated reasons, and those set forth in Jared Baraloto's opening brief, this Court should grant the relief requested in the opening brief.

Respectfully submitted,

/s/ Steven H. Levin
Steven H. Levin
Levin & Curlett LLC
250 West Pratt Street
Suite 1300
Baltimore MD 21201

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [ X ] this brief contains [*3,934*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

   [    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: February 1, 2013                      /s/ Steven H. Levin
                                             *Counsel for Apellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 1st day of February, 2013, I caused this Reply

Brief of Appellant to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to the following registered

CM/ECF users:

Sujit Raman
OFFICE OF THE U.S. ATTORNEY
36 South Charles Street, Fourth Floor
Baltimore, Maryland  21201
(410) 209-4973

*Counsel for Appellee*

I further certify that on this 1st day of February, 2013, I caused the required

copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Steven H. Levin
*Counsel for Appellant*